* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission, and the Commission has jurisdiction of the parties and of the subject matter.
2. The employer-employee relationship existed at the time of plaintiff's compensable injuries, and continues in effect.
3. Defendant-employer regularly employs three or more employees, and is bound by the North Carolina Workers' Compensation Act, and the North Carolina Industrial Commission has jurisdiction to hear this matter.
4. On May 23, 2003, defendant ESIS was at risk for payment of workers' compensation claims of its employees, including plaintiff, for the self-insured employer.
5. The parties stipulated that plaintiff's average weekly wage would be calculated from Form 22. Although defendant was given thirty days to submit a Form 22, they failed to submit one at any time prior to the closing of the record.
In addition, the parties stipulated into evidence the following:
 1. Packet of medical records and reports.
 2. Plaintiff's discovery responses.
 3. Medical chart from the company medical department.
 4. Earnings printout.
 5. Packet of Industrial Commission forms.
The Pre-Trial Agreement dated May 2, 2005, which was submitted by the parties, is incorporated by reference.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who is forty-two years old and a high school graduate, began working for defendant-employer as an employee on October 21, 1991. However, he had worked in the plant prior to that date through a temporary employment agency.
2. Defendant-employer manufactures diesel engines. In May 2003, plaintiff's position was certified technician. His duties included harnessing engines as they came down a conveyor, so that they could be tested, and then "deharnessing" them. His average weekly wage could not be determined because defendant failed to submit a Form 22 wage chart, and the wage information stipulated into evidence indicated that plaintiff may have had some unpaid leave of over seven days in August and September, 2002.
3. On Friday May 23, 2003 plaintiff has alleged that he injured his back at work when the "horse" used to remove a dummy flywheel gave way and dropped to the floor, and he tried to catch the flywheel. Although he went to the medical department that day, he did not advise the nurse that he had hurt himself at work. He simply requested pain medication, which was provided. When he subsequently returned to his work area, plaintiff asked a co-worker, Calvin Williams, who was his second cousin, to trade jobs with him because his back was bothering him. It was normal business practice for the technicians to rotate jobs during the day, and Mr. Williams cooperated.
4. Plaintiff returned to work the following Monday but indicated that he left early that day due to back pain. The next day, May 27, plaintiff went to the emergency room at Heritage Hospital where he was seen by Dr. Freydl for complaints of pain in his upper back between his shoulder blades, which he stated had been present for three weeks and which was worse at the end of the day. Plaintiff denied having had an injury or fall when Dr. Freydl questioned him. Dr. Freydl prescribed medication for him and restricted him to light duty work.
5. The following day, plaintiff called the company's medical department and spoke to nurse Charlotte James. Plaintiff advised Ms. James that he had been to the emergency room for back pain over the weekend, that he did not know what had caused his back to hurt but that he would be out of work for the rest of the week.
6. On June 2, 2003 plaintiff went to the Tarboro Clinic and saw physician's assistant Clifford Amos. He requested stronger pain medication for his upper back pain. Mr. Amos did not note any history of a specific injury. He prescribed Darvoset for plaintiff on that occasion.
7. Plaintiff subsequently returned to the clinic on June 9, 2003 and saw Dr. Elijah Gregory. Plaintiff continued to complain of severe upper back pain between his shoulder blades, which he indicated had been present for a month. Although he did not attribute his symptoms to his job, plaintiff expressed concern about his ability to perform his job duties. Dr. Gregory diagnosed him with a upper back strain and prescribed a steroid dose pack in addition to anti-inflammatory and muscle relaxant medication. When plaintiff returned on June 13 and 30, 2003 his symptoms were no better. Dr. Gregory ordered an MRI, but the test could not be performed because plaintiff had a bullet imbedded in his chest. Consequently, the doctor referred him to Dr. David Miller, an orthopedic surgeon.
8. Dr. Miller examined plaintiff on July 23, 2003. It was at this examination that plaintiff first described having sustained an injury at work. Dr. Miller noted a history of plaintiff using a horse to remove a flywheel, turning and then feeling a sharp pain between his shoulder blades. Plaintiff reported having interscapular thoracic back pain which radiated to his cervical spine and to his arms. On examination, he had a signs of carpal tunnel syndrome. Dr. Miller reviewed the x-rays taken at the emergency room, which appeared to show an old compression fracture of T5 which was stable since a prior x-ray taken in 2001. He then ordered a myelogram/CT scan.
9. Although plaintiff underwent the testing in August, he did not return to Dr. Miller until October 13, 2003. The myelogram/CT scan did not show evidence of nerve or spinal cord compression and did not reveal other findings consistent with the reported symptoms. Consequently, Dr. Miller concluded that he did not have anything to offer plaintiff and referred plaintiff to Dr. Christopher Godbout for pain management.
10. Dr. Godbout evaluated plaintiff on November 10, 2003 and diagnosed him with myofascial pain syndrome of the thoracic spine. The doctor prescribed a narcotic medication patch, as well as other medication and physical therapy. Plaintiff returned on December 12, 2003 reporting that he had not improved but rather had additional symptoms of pain radiating down his arms and legs. Plaintiff also indicated that he was having bad side effects from the patch. Consequently, the doctor switched him an oral narcotic. Dr. Godbout did not believe that the arm and leg pain was related to the alleged injury. He gave plaintiff restrictions of no lifting more than twenty-five pounds and no carrying more than fifteen pounds.
11. Defendant then sent plaintiff to Dr. Shepherd Rosenblum, an orthopedic surgeon, for a second opinion. Dr. Rosenblum examined him on January 16, 2004. Plaintiff complained of chronic pain in his neck and upper back which was interfering with his sleep and activities. However, he did not describe any true radicular symptoms. On examination, there were no neurological deficits, there was no atrophy and there was no evidence of myelopathy. Dr. Rosenblum reviewed the myelogram/CT scan and found it to be essentially unremarkable. He diagnosed plaintiff with mechanical or muscular type pain without objective evidence of pressure on the nerves or damage to the spinal column. He also noted that plaintiff was in surprisingly good physical shape for someone having chronic and severe pain, and he questioned whether plaintiff was in as much pain as reported. Given his objective findings, Dr. Rosenblum felt there was little room to improve.
12. As of January 16, 2004 Dr. Rosenblum believed plaintiff was at maximum medical improvement and released plaintiff to try to return to work in his regular job, since there were no objective findings to warrant restrictions. Assuming that plaintiff's complaints were substantially accurate, Dr. Rosenblum advised him to follow-up with pain management.
13. Later that day, plaintiff returned to Dr. Godbout with persistent complaints. Dr. Godbout was surprised that he had not responded to appropriate therapy. With his type of condition, most patients would have improved enough to return to work at full duty within three to six months. In order to rule out an occult problem, Dr. Godbout ordered a bone scan, which proved to be negative for any finding which would correlate with the reported symptoms. Despite the lack of objective findings, the doctor increased the narcotic medication he was prescribing.
14. Plaintiff did not return to Dr. Godbout's office until May 27, 2004, when he saw the physician's assistant there. Plaintiff reported that he had had problems with insurance coverage and that he had been without pain medication for a month. Despite the lack of narcotic medication, his pain scores were the same. This was a sign of narcotic drug dependency, so he was not given more narcotics on that occasion. He subsequently returned on June 28, 2004 with complaints of constant, throbbing, stabbing pain. Dr. Godbout ordered a drug screen at that time but was unaware whether one was performed. However, plaintiff later advised Dr. Gregory that he had tested positive for illegal substances and had been terminated from the pain management program. Despite strong reservations, Dr. Gregory subsequently prescribed ongoing narcotic medication for plaintiff.
15. As of the date of hearing before the Deputy Commissioner, plaintiff had not returned to work since May 2003. He made no effort to find employment after defendant-employer terminated him in February 2004.
16. The record was not clear regarding when defendant received actual notice of plaintiff's alleged injury. Ms. James called plaintiff on July 23, 2003 after receiving a call from Dr. Miller's office, and asked him if he had been injured at work. Plaintiff told her on that occasion that he did not tell anyone that his injury was work-related because he did not know, but that he must have hurt his back at work. The claims adjuster subsequently assigned to the case, Trisha Scrivener, received the file on September 8, 2003 and called Charlotte James on September 16, but Ms. James was not able to provide much information at that time. Plaintiff filed a Form 18 with the Industrial Commission on October 6, 2003 which explained how he claimed to have been injured.
17. Ms. Scrivener went on medical leave for a period of time in October and November 2003. In her absence, a Form 63 was prepared and submitted to the Industrial Commission for payment of compensation without prejudice. Plaintiff had received his full salary for three months and had received seventy-five percent of his salary for three months pursuant to an employer-funded program. Consequently, the Form 63 provided that his disability began on November 25, 2003 instead of May 27, 2003. Plaintiff received two checks of temporary total disability compensation.
18. When Ms. Scrivener returned from medical leave, she was unaware that a Form 63 had been submitted to the Industrial Commission. She arranged for the independent medical examination by Dr. Rosenblum and, after reviewing his findings, decided to deny the claim by Form 61 dated February 25, 2004. Although the Form 61 denial appeared to have been filed within ninety days of the Form 63, it was not filed within ninety days of the date when defendant received actual notice of the injury. The latest defendant would have received notice would have been October 6, 2003 when plaintiff filed the Form 18.
19. Plaintiff's allegation of how he developed upper back pain was not credible. He not only did not tell anyone at work or any of his treating physicians about having sustained an injury at work until approximately two months later, but he also told the doctors who treated him initially that he had been having symptoms since early May 2003, he denied having sustained an injury when questioned by Dr. Freydl in the emergency room and he told Ms. James in May 2003 that he did not know what had caused his back to hurt. Nevertheless, defendant filed a Form 63 and did not deny liability within ninety days of receiving notice of the injury. Consequently, defendant admitted liability for the injury.
20. As of January 16, 2004, plaintiff was capable of performing his regular job duties with defendant-employer. His allegations to the contrary are not accepted as credible. Plaintiff made no effort to return to work for any employer. However, prior to January 16, 2004 he was unable to perform his regular job duties with defendant-employer and the company did not provide him with suitable light work.
21. There was no evidence presented regarding whether plaintiff sustained any permanent partial disability as a result of the injury giving rise to this claim. Consequently, no finding is made regarding that issue.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Having submitted a Form 63 to the Industrial Commission for payment without prejudice, having paid compensation to plaintiff for temporary total disability, and having not denied the claim within ninety days of receiving written or actual notice of the injury, defendant admitted liability for the claimed injury of May 23, 2003. N.C. Gen. Stat. §97-18 (d).
2. As the result of the compensable injury by accident, plaintiff was temporarily totally disabled and entitled to compensation for temporary total disability from May 27, 2003 through January 16, 2004 but subject to a credit in favor of defendant for the salary continuation program payments for six months and for the disability compensation previously paid. N.C. Gen. Stat. §§ 97-29; 97-42.
3. Plaintiff is entitled to have defendant provide all medical compensation arising from this injury by accident. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay any remaining compensation due to plaintiff for temporary total disability for the period from May 27, 2003 through January 16, 2004 after credits for the salary continuation program and for compensation previously paid have been taken. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded is hereby approved for plaintiff's counsel, which fee shall be deducted from the aforesaid award and paid directly to Mr. Johnson.
4. Defendant shall pay the costs.
This 7th day of December 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER